## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4432 | **DATE** | JUL 19 2001 |
| **CASE TITLE** | Abbott Labs v. Watson Pharm. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, Abbott's motion for preliminary relief [Doc. #7] is granted in part. Watson is enjoined from making the following misrepresentations: (1) that the manufacturer of Synthroid violated the FDA's August 1997 Notice by failing to file an NDA for Synthroid; (2) that Synthroid is not safe and effective and that the FDA's denial of the petition seeking GRAS/E status for Synthroid demonstrates that Synthroid is not safe and effective; and (3) that the FDA's approval of Unithroid's NDA application means that it is a superior product to Synthroid and other levothyroxine products that have not yet received NDA approval.

(11) ■ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | JUL 20 2001 | |
| ✓ | Notified counsel by telephone. | | date docketed | 44 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING | | |
| dc(lc) | courtroom deputy's initials | 01 JUL 19 PM 6:47 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ABBOTT LABORATORIES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 01 C 4432 |
| v. ) | |
| ) | HONORABLE DAVID H. COAR |
| WATSON PHARMACEUTICALS, INC. ) | |
| and WATSON PHARMA, INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Abbott Laboratories ("Abbott") seeks a preliminary injunction against its competitor, Watson Pharmaceuticals, Inc., and Watson Pharma, Inc. (collectively, "Watson") in connection with Watson's sales and marketing effort of Unithroid, a drug used in the treatment of thyroid disease. A hearing was held before this court to determine whether a preliminary injunction should issue. In view of the record presented and the testimony offered at the hearing, the court grants Abbott's motion in part.

### I. Standard of Review

To obtain a preliminary injunction, the party seeking such relief must establish: (1) the likelihood of success on the merits; (2) the lack of an adequate remedy at law; and (3) irreparable harm. Abbott Lab. v. Mead Johnson & Co., 971 F.2d 6, 11 (7th Cir. 1992). If the moving party is unable to make this threshold showing, preliminary relief will be denied. If the moving party

satisfies this threshold, the court must consider the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied. Id. Lastly, the court must also factor in the public interest, that is, the consequences to non-parties of granting or denying the injunction. Id. Under the sliding scale approach, the more likely it is that the plaintiff will succeed on the merits, the less the balance of irreparable harms need weight towards its side; the less likely it is the plaintiff will succeed, the more the balance of harms need weigh towards its side. Id.

The case before the court is a false advertising claim brought under § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). This provision prohibits the use in commerce of "any . . . false or misleading description of fact or false or misleading representation of fact which in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods. . . . 15 U.S.C. § 1125(a)(1)(B). This prohibition against misrepresentation applies with equal force to statements that are literally false and statements that, while literally true or ambiguous, nevertheless "convey a false impression or are misleading." Mead Johnson, 971 F.2d at 13 (listing cases).

## II. Background

Abbott manufactures and distributes Synthroid, a levothyroxine sodium drug widely used for the treatment of thyroid deficiency. Watson also markets a levothyroxine sodium product called Unithroid. Synthroid claims a market share of approximately three quarters of all thyroid replacement drugs used today in comparison with approximately 1% of the market accounted for by Unithroid. Abbott claims that, in an attempt to boost their market share, Watson's sales

representatives have made false claims against Synthroid in an effort to scare doctors into switching from the more popularly prescribed Synthroid to Unithroid.

On August 14, 1997, the Food and Drug Administration ("FDA") announced that orally administered levothyroxine sodium products would be considered new drugs. As such, all levothyroxine sodium drugs, which had previously fallen into a regulatory void, were required to obtain FDA approval. To do so, manufacturers could file a New Drug Applications ("NDAs"), or, in the alternative, seek to qualify as Generally Recognized as Safe and Effective ("GRAS/E").

Initially, the FDA set forth a deadline of August 14, 2000, by which time manufacturers of levothyroxine sodium products were required to submit NDA or GRAS/E applications. This deadline was later extended to August 14, 2001. Although levothyroxine products could remain on the market until that deadline, the FDA's pronouncements were ambiguous as to the fate of unapproved drugs after August 14. Those drugs without FDA approval after August 14, 2001, cautioned the agency, would be "subject to regulatory action." In other statements, the FDA warned that manufacturers were required to obtain approved applications by the August deadline if they wished to continue marketing.

Unithroid's previous manufacturer, Jerome Stevens Pharmaceuticals[1], opted to file an NDA for Unithroid. On August 21, 2000, the FDA approved Unithroid and deemed it safe and effective for the treatment of thyroid conditions. Levoxyl, another competing levothyroxine sodium product, was also approved in May 2001. Knoll Pharmaceuticals ("Knoll"), the former

---

[1] Watson acquired the right to market Unithroid from its manufacturer Jerome Stevens in 2000.

-3-

manufacturer of Synthroid[2], elected to pursue GRAS/E status for Synthroid. On April 26, 2001, the FDA denied the GRAS/E application and determined that Synthroid could not be deemed generally recognized a safe and effective. As of the issuance of this opinion, Abbott has yet to file an NDA.

### III. Discussion

Abbott asks the court to enjoin Watson's sales representatives from making the following statements:

(1) That Synthroid will be taken off the market come August 2001;

(2) That the manufacturer of Synthroid violated the FDA's August 1997 Notice by failing to file an NDA for Synthroid;

(3) That Synthroid is not safe and effective and that the FDA's denial of the petition seeking GRAS/E status for Synthroid demonstrates that Synthroid is not safe and effective;

(4) That the FDA's approval of Unithroid's NDA application means that it is a superior product to Synthroid and other levothyroxine products that have not yet received NDA approval.

As will be further discussed below, Abbott has demonstrated, to the satisfaction of this court, that Watson made all of the claims alleged above. As far as three of the statements are concerned, the court finds that Abbott is likely to succeed on the merits and that the balance of harms favors the granting of preliminary relief.

The evidence submitted by Abbott corroborates that Watson has been making the above representations. Abbott marshals affidavits of a number of health care professionals nationally

---

[2] Abbott acquired Knoll's rights to Synthroid in March of 2001.

who attest to Watson representatives urging them to switch patients to Unithroid because Synthroid did not meet quality standards and evidences safety problems, and thus will not receive FDA approval. See Pl. Exh. 30-36[3]; Tr. 65-71 (testimony of executive director of Thyroid Society of Education and Research). Furthermore, Abbott, in the ordinary course of business, maintained a log of damaging statements made by Watson representatives to health care providers during sales calls.[4] See Pl. Exh. 23, 38; Tr. at 110.

Watson denies making any of the alleged statements. In fact, Watson sales representatives insist that they merely reiterated the FDA's determinations without deviation. They deny making the representations cited in the declarations proffered by nurses and doctors on behalf of Abbott See Def. Exh. 22-30. In the face of conflicting evidence, the court resolves all credibility issues in favor of Abbott. The court is persuaded that Watson made the alleged representations about Synthroid.

Moreover, the court finds that three of the four statements made by Watson were misleading and false. First, contrary to Watson's representation, Synthroid did not violate the 1997 FDA mandate by not filing an NDA. In a February 12, 2001, press release, Watson claimed that "the FDA issued a mandate in August 1997 requiring that all manufacturers of levothyroxine sodium have a complete and approved NDA filed by August 2000 to continue marketing. . . . To

---

[3] Abbott submitted a third volume of exhibits after the close of its case at the hearing. Although the court has not relied on exhibits 40-60 contained in volume III, the court notes that Abbott proffered these additional affidavits in support of its claim that Watson representatives relayed false information to health care professionals about Synthroid.

[4] Watson argues that the log constitutes hearsay, and it does indeed. However, even in light of the minimal weight accorded to this document, the court finds that, in the totality of the evidence presented, it is sufficiently convincing.

date, only the manufacturers of Unithroid has complied with the FDA mandate...." Pl. Exh. 4. See also Pl. Exh. 5, 6. These statements incorrectly imply that other levothyroxine manufacturers have not complied with the FDA mandate.

In 1997, the FDA gave manufacturers the option of filing an NDA or a citizen's petition seeking GRAS/E status. Unlike Watson's predecessor, Knoll, the then-manufacturer of Synthroid, elected to file a GRAS/E application instead of an NDA. That did not mean, however, that it did not comply with the FDA's notice. In the aftermath of the denial of the GRAS/E petition, Abbott may still timely file an NDA until August 14, 2001. See Tr. at 139. Watson's statements are misleading because they omit any mention of the alternative GRAS/E application option, and because they do not disclose that applicants may act until August in full compliance with the FDA's mandate.

Second, the FDA did not proclaim Synthroid to be not safe and effective when it denied the GRAS/E petition. "Generally safe and effective," the status sought by Synthroid in the GRAS/E petition, is a term of art with a narrow regulatory meaning. In declining to grant Synthroid GRAS/E status, the FDA deemed Synthroid not exempt from the requirements of the NDA application. Specifically, the FDA cited Knoll's failure to submit evidence addressing the stability and potency of Synthroid as the reason for the denial of GRAS/E status. See Def. Exh. 1. The FDA, however, did not foreclose Synthroid from filing an NDA and obtaining the approval need to classify Synthroid as safe and effective. See Tr. at 138-140. Granted, the FDA has not yet approved Synthroid as safe and effective, but by no means has it made an affirmative determination that it is *not* safe and effective. See Tr. at 50.

Third, the FDA's approval of Unithroid cannot be touted as an endorsement of Unithroid's safety and efficacy over that of other unapproved drugs. When Watson claims that Unithroid is the "only levothyroxine sodium considered safe and effective by the FDA," that statement is false. See Pl. Exh. 21 (promotional brochure). In contrast, Watson's claim that Unithroid is "[t]o date, [ ] the first and only NDA-approved oral levothyroxine sodium product approved as safe and effective by the FDA," is a factually accurate statement. See Pl. Exh. 6 (May 1 press release). The distinction is nuanced, to be sure. However, the former statement, devoid of the language limiting the veracity of its representation to date, prematurely forecloses the possibility that other products will also be approved by the FDA.

Synthroid claims to be prepared to file an NDA application supported by an abundance of scientific studies that prove its long history of safety and efficacy. If that is true, then the FDA's approval of its NDA application is a very real and likely possibility that cannot reasonably be foreclosed before the deadline for submitting applications.[5] The FDA cannot be deemed to have judged Unithroid the superior drug product when Synthroid's NDA application is yet to be reviewed. If the FDA approves Synthroid, all approved drugs, including Unithroid and Synthroid, will have equal standing. In fact, the FDA has explicitly dismissed the notion that the agency has endorsed Unithroid over other products: "[T]he implied superiority claims inherent in [Unithroid's promotional] materials are misleading because [Unithroid] has not been demonstrated to be safer or more effective than any other levothyroxine sodium product. . . .

---

[5] The court expresses no opinion on the safety and efficacy of the competing levothryoxine products. That determination is within the province of the FDA. This court's ruling is limited to a legal determination that certain statements made by Watson were misleading in view of the FDA's determinations.

[C]laims of superiority would require head-to-head clinical trials." Pl. Exh. 12 (FDA monitoring and surveillance letter). Accordingly, Watson's superiority and exclusivity claims are misleading.

With respect to the final misrepresentation cited by Abbott, the court finds that it was not in fact misleading. Watson urged health care professionals to switch to Unithroid in preparation for Synthroid's withdrawal from the market on August 15, 2001. Although, in view of the widespread patient dependance on Synthroid, the proposition seems unreasonable, it appears that in some instances, the FDA suggested just that result.

The FDA expressly permitted all unapproved levothyroxin sodium products to be marketed until the August 2001 deadline. The agency's pronouncements of the fate of unapproved products after that deadline, however, were ambiguous. The FDA stated that unapproved drugs would, at that time, be "subject to regulatory actions," which meant that the FDA could take a range of actions, including forced withdrawal from the market. The FDA also construed the deadline as the last day until which manufacturers of unapproved levothyroxine sodium products "could continue to market their products." See Def. Exh. 5. This latter statement seemed to indicate that the FDA contemplated that all unapproved drugs would indeed be taken off the market after the August 2001 deadline.[6] Thus, Watson was entitled to rely on that statement in concluding that the FDA planned to withdraw Synthroid from the market absent

---

[6] In view of this ambiguity, the FDA issued a guidance on July 12, 2001, the day before the conclusion of this hearing. In that guidance, the FDA announced that levothyroxine sodium products that were not approved by August 14, 2001, would be subject to a gradual phase-out in distribution.

an approved NDA by the deadline. Moreover, the July 12, 2001, guidance resolves any irreparable issues as to what the FDA will do after August 14, 2001.

In sum, with the exception of this final statement, Watson is hereby enjoined from representing: (1) that the manufacturer of Synthroid violated the FDA's August 1997 Notice by failing to file an NDA for Synthroid; (2) that Synthroid is not safe and effective and that the FDA's denial of the petition seeking GRAS/E status for Synthroid demonstrates that Synthroid is not safe and effective; and (3) that the FDA's approval of Unithroid's NDA application means that it is a superior product to Synthroid and other levothyroxine products that have not yet received NDA approval.[7]

Abbott has demonstrated that it will likely be irreparably injured in the absence of preliminary relief. In a false advertising case such as this one, the campaigns have a short lifespan but the resulting damage can be grave. See, e.g., Mead Johnson, 971 F.2d at 16 (noting that comparison advertising can "dent[ ] [a company's] reputation"); McNeilab, Inc. v. American Home Prods. Corp., 848 F.2d 34, 38 (2d Cir. 1988) (observing that misleading comparisons can "diminish the [competing product's] value in the minds of consumer[s]"). Because of the timing issues built into this case, namely, the impending nature of the August 14, 2001 deadline, the need for a preliminary injunction is even more urgent.

Additionally, considerations for the public interest weigh in favor of granting preliminary relief. The public certainly is entitled to truthful advertising. And this consideration is especially weighty in this case because of the risks involved in patients unnecessarily switching drugs as a

---

[7] Of course, if Abbott fails to submit the necessary NDA application by the August 14, 2001 deadline, then Waton's representations would be warranted.

result of false advertising. As the American Association of Clinical Endocrinologists ("AACE") explained in a public statement issued June 1, 2001:

> AACE is greatly concerned that the precipitous removal of [Synthroid] would create a massive and expensive burden for both patients and physicians alike. Synthroid patients would have to visit physicians for an alternative medication. This would also require a significant change in pharmacy orders. Moreover, patients will be confused and unnecessarily alarmed over the safety of the drug.

Pl. Exh. 13.

Lastly, the court finds that Watson will not suffer undue hardships because of this preliminary injunction. Watson is free to urge health care professionals to prescribe its drug over Synthroid. However, it cannot do so by way of misrepresentations. Watson may inform others of the actions taken by the FDA and it may certainly disseminate the materials issued by the FDA, but it may not share false and misleading conclusions drawn therefrom.

## IV. Conclusion

For the foregoing reasons, Abbott's motion for preliminary relief is granted in part. Watson is enjoined from making the following misrepresentations: (1) that the manufacturer of Synthroid violated the FDA's August 1997 Notice by failing to file an NDA for Synthroid; (2) that Synthroid is not safe and effective and that the FDA's denial of the petition seeking GRAS/E status for Synthroid demonstrates that Synthroid is not safe and effective; and (3) that the FDA's approval of Unithroid's NDA application means that it is a superior product to Synthroid and other levothyroxine products that have not yet received NDA approval.

Enter:

_____
David H. Coar
United States District Judge

Dated: JUL 19 2001

-11-